# In the United States Court of Federal Claims

|  |  |
|---|---|
| EFC SERVICES, INC., | No. 17-cv-223 |
| Plaintiff, | Filed Under Seal: August 5, 2024 |
| v. | Publication: August 19, 2024[1] |
| THE UNITED STATES, | |
| Defendant. | |

*Hal J. Perloff* of Husch Blackwell LLP, Washington, DC argued for Plaintiff. With him on the briefs was *Eric J. Singley*, Husch Blackwell LLP, Washington, DC.

*Albert S. Iarossi*, United States Department of Justice, Assistant Director, Commercial Litigation, Washington, DC argued for Defendant. With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Washington, DC; *Patricia M. McCarthy*, Director, Commercial Litigation, Washington, DC; *Deborah A. Bynum*, Assistant Director, Commercial Litigation, Washington, DC.

## MEMORANDUM AND ORDER

This case arises out of a Lease between the General Services Administration (GSA) and Plaintiff EFC Services, Inc. to build a courthouse in Saipan, Commonwealth of the Northern Mariana Islands. Plaintiff alleges that Defendant first breached the Lease, rendering Defendant's termination of the Lease for default invalid. Defendant counters that its decision to terminate the Lease for default was justified due to Plaintiff's non-performance.

Pending before this Court is Plaintiff's Corrected Motion for Partial Summary Judgment (ECF No. 102) (Pl. Mot.) and Defendant's Response in Opposition to Plaintiff's Motion for

---

[1] This Memorandum and Order was filed under seal, in accordance with the Protective Order entered in this case (ECF No. 42) and was publicly reissued in its entirety, as agreed to by the parties (ECF No. 111). The versions are identical, except for the publication date and this footnote.

Partial Summary Judgment and Cross-Motion for Partial Summary Judgment (ECF No. 105) (Def. Cross-Mot.).[2]  The motions are fully briefed, and this Court conducted Oral Argument on June 18, 2024.  Having considered the parties' arguments and applicable law, this Court finds there are genuine issues of material fact that prevent the Court from granting summary judgment for either party.  Accordingly, this Court **DENIES** Plaintiff's Corrected Motion for Partial Summary Judgment and **DENIES** Defendant's Cross-Motion for Partial Summary Judgment.

<u>**BACKGROUND**</u>

## I.   **Factual Background**

In September 2013, the GSA issued a Request for Lease Proposal (RLP) to design and construct a courthouse to house the U.S. District Court, the U.S. Marshals Service, the U.S. Probation Office, and the U.S. Attorney's Office in Saipan, Commonwealth of the Northern Mariana Islands.  *See* GSA Request for Lease Proposal No.1MP2006SAIPAN/MP (ECF No. 102-3) at 9, 12; *see also* Def. Cross-Mot. at 7, 9.  Plaintiff and two other bidders submitted proposals. Def. Cross-Mot. at 9.  Throughout the RLP process, Plaintiff submitted multiple versions of its courthouse design, and in November 2014, Plaintiff submitted a final design, Scheme 4, as its "best and final offer."  EFC "Best and Final Offer," dated Nov. 12, 2014 (ECF No. 102-3) at 66–81. The Government's Source Selection Evaluation Board reported no weaknesses or deficiencies related to Scheme 4's "Facility Design" and "Site Layout and Design" before awarding the Lease. Pl. Mot. at 11 (citing GSA Evaluation Letter, dated Sept. 22, 2014 (ECF No. 102-3) at 61–65; Final Report and Source Selection Decision (ECF No. 102-3) at 84–99).

---

[2] With the exception of depositions, citations throughout this Memorandum and Order reference the ECF-assigned page numbers, which do not always correspond to the pagination within the document.  For depositions, citations reference the internal deposition pagination, rather than the ECF-assigned page numbers.

2

In March 2015, the Government and Plaintiff signed the Lease and incorporated Scheme 4 into the Lease.  *See id*. (citing Lease No. GS-09B-03180 (ECF No. 102-1) (Lease) at 20).  In Saipan, "the acquisition of permanent and long-term interests in real property . . . is restricted to persons of Northern Marianas descent."  *Id*. at 10 (citing Declaration of Efrain Camacho (ECF No. 102-1) (Camacho Decl.) at 1).  Accordingly, the courthouse was to be built on land belonging to Plaintiff and would remain Plaintiff's property upon termination of the Lease tenancy.  *Id.* (citing Camacho Decl. at 1).

The Lease set out a basic timeline for the completion of the project.  Namely, after the contract was awarded, the winning bidder would participate in a "Design Intent Drawing" (DID) Workshop.  Lease at 43.  The resulting plans (DID plans) were to serve as "fully dimensioned drawings of the leased Space which reflect all Lease requirements provided by the Government sufficient for the preparation of construction documents."  *Id*.  The contractor would then submit construction documents based on the DID plans, which the Government would review.  *Id.*  Upon notice to proceed, the contractor would have 180 days to complete all work on the building.  *Id.*

On or around March 15, 2015—before the Government and EFC had entered into the Lease—an architect for the U.S. Courts, Walter Popen, began working on the Government's own courthouse design, Scheme W; Mr. Popen continued to work on Scheme W during the pendency of a bid protest that temporarily ceased Plaintiff's work on the project.  Pl. Mot. at 12 (citing Deposition of Walter Popen, dated Jan. 7, 2022 (ECF No. 102-3) at 154:5–155:17); *see also* Def. Cross-Mot. at 18.  On June 2, 2015, the Government's contracting officer, Daniel McGrath, forwarded Scheme W to Plaintiff.  Email, dated June 2, 2015 (ECF No. 102-3) at 108; *see also* Def. Cross-Mot. at 18.

On August 2, 2015, Typhoon Soudelor struck Saipan, resulting in Plaintiff asking for an "indefinite extension" to focus on typhoon recovery efforts. Def. Cross-Mot. at 23 (quoting Deposition of Efrain Camacho, dated Jan. 22, 2023 (ECF No. 105-1) (Camacho Depo.) at 207:13–208:2). In response, Mr. McGrath suggested a modified schedule wherein Plaintiff would not need to provide any updates for 50 days. *See id.* at 23–24 (citing Email, dated Aug. 12, 2015 (ECF No. 105-1) (Aug. 12, 2015 Email) at 809; Camacho Depo. at 213:5–215:1). Plaintiff agreed to work towards that plan but reiterated that it would need to direct its primary attention towards typhoon recovery. *See id.* at 24 (citing Aug. 12, 2015 Email at 809). As a result of the typhoon, the DID Workshop, which was scheduled for August 3, 2015, was relocated to Guam. Camacho Decl. at 4–5. Mr. Camacho, along with other representatives from his company, were unable to attend. *Id.* at 5. Ultimately, only Plaintiff's architect participated in the Workshop on behalf of Plaintiff. *Id.*

Following the DID Workshop, Mr. Camacho emailed his team on August 13, 2015 and "told them to put everything on hold because [he] needed time to review the post-DID plans." *See id.* at 6. On October 21, 2015, Plaintiff informed the Government, for the first time, that Scheme W constituted a cardinal change to the courthouse design. *See* Rule 30(b)(6) Deposition of Efrain Flores Camacho, dated Jan. 24, 2024 (ECF No. 105-1) (Camacho 30(b)(6) Depo.) at 209:8–14. On December 11, 2015, Plaintiff submitted a claim for termination for convenience, which the Government subsequently denied on February 26, 2016. Claim for Termination of the Lease on the Saipan Courthouse Project (ECF No. 105-1) at 838; Contracting Officer's Final Decision, dated Feb. 26, 2016 (ECF No. 105-1) at 871–74. Also on February 26, 2016, Defendant issued a Cure Notice informing Plaintiff it was in default and would need to notify the Government of its intention to move forward with Scheme W and provide a deadline by which it would submit DID plans for approval. *See* Cure Notice, dated Feb. 26, 2016 (ECF No. 105-1) at 875–76. On March

4

8, 2016, Plaintiff countered that the Government had materially breached the contract, which excused Plaintiff from performance.  *See* Cure Notice – Response of EFC Services Corp., dated Mar. 8, 2016 (ECF No. 105-1) at 877–78.  The Government subsequently terminated the Lease for default on March 23, 2016.  *See* Termination for Default, dated March 23, 2016 (ECF No. 105-1) at 879–81.

## II.   Procedural Background

On February 16, 2017, Plaintiff filed a Complaint alleging breach and wrongful termination of the Lease.  Complaint (ECF No. 1) at 1.  Plaintiff subsequently amended its Complaint twice. *See* Amended Complaint (ECF No. 10); Second Amended Complaint (ECF No. 15-1); *see also* Order, dated Jan. 16, 2018 (ECF No. 16) (granting Plaintiff's Motion to File a Second Amended Complaint (ECF No. 15)).  On February 21, 2018, Defendant filed its Answer to the Second Amended Complaint and Counterclaim.  ECF No. 17.  In its counterclaim, Defendant asserts that Plaintiff is liable for the Government's "excess reprocurement costs, liquidated damages, and travel costs of $15,462,898.71, plus interest."  *Id.* at 26.  On March 12, 2018, Plaintiff filed its Answer to Defendant's Counterclaim.  *See* Plaintiff's Answer to Counterclaim (ECF No. 18). Following the Joint Preliminary Status Conference, the Court ordered discovery to proceed "only on the issues of liability," thus bifurcating liability and damages issues.  Order, dated May 17, 2018 (ECF No. 21); *see* Oral Argument Transcript, dated June 18, 2024 (ECF No. 109) (OA Tr.) at 80:24–25.

On February 27, 2020, the matter was reassigned to the undersigned judge.  *See* Notice of Reassignment (ECF No. 58).  Following multiple amendments to the matter's discovery schedule, on March 16, 2022, this Court granted the parties' joint motion to stay proceedings to permit Defendant time to seek authorization to participate in alternative dispute resolution (ADR).  *See*

Order, dated Mar. 16, 2022 (ECF No. 74).   On March 30, 2022, this Court granted the parties'
request to continue the stay in order to pursue ADR before the Honorable Allan H. Goodman of
the Civilian Board of Contract Appeals.   Order, dated Mar. 30, 2022 (ECF No. 76).   The case
remained stayed until November 10, 2023.   *See* Order, dated Sept. 12, 2023 (ECF No. 90).   On
November 10, 2023, the parties filed a Joint Status Report informing the Court that while they
intended to continue seeking a resolution through ADR, they had been unable to resolve their
claims to date.   Joint Status Report (JSR) (ECF No. 91) at 1.   As such, the parties proposed a
schedule for future proceedings, which the Court adopted.   Scheduling Order, dated Nov. 13, 2023
(ECF No. 92) (Sched. Order); *see also* JSR at 1–2.   On January 4, 2024, the Court granted the
parties' request to terminate ADR proceedings.   Order, dated Jan. 4, 2024 (ECF No. 94).   On
January 31, 2024, the parties concluded discovery.   *See* Sched. Order at 1.

On April 1, 2024, Plaintiff filed its initial Motion for Partial Summary Judgment.   ECF No.
99.   On April 12, 2024, Plaintiff filed a corrected Motion in order to correct a technical error with
its Table of Contents and to update the signature blocks of counsel with a new firm address.   *See
generally* Pl. Mot.; *see also* Plaintiff's Unopposed Motion for Leave to File Corrected Motion for
Partial Summary Judgment (ECF No. 101) at 1; Minute Order, dated Apr. 12, 2024 (granting
Plaintiff's Motion for Leave).   On May 3, 2024, Defendant filed its Response to Plaintiff's Motion
and its own Cross-Motion.   *See generally* Def. Cross-Mot.   On May 24, 2024, Plaintiff filed its
Reply supporting its Motion and Response to Defendant's Cross-Motion.   *See* Plaintiff's Reply in
Support of Plaintiff's Motion for Partial Summary Judgment and Response to Defendant's Cross-
Motion for Partial Summary Judgment (ECF No. 106) (Pl. Reply).   On June 12, 2024, Defendant
filed its Reply in Support of its Cross Motion for Partial Summary Judgment.   ECF No. 107 (Def.

Reply). On June 18, 2024, the Court conducted Oral Argument on the pending Motion and Cross-Motion. *See* Minute Entry, dated June 18, 2024.

## APPLICABLE LEGAL STANDARD

A court may grant summary judgment if there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Rules of the United States Court of Federal Claims (Rule) 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 250 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390–91 (Fed. Cir. 1987); *Ralph Larsen & Son, Inc. v. United States*, 17 Cl. Ct. 39, 42 (1989). To make this determination, the Court must first consider whether the issues at the heart of the motion for summary judgment are factual, as opposed to legal, issues. To the extent there are factual issues, the Court must determine which factual issues are *material* to the disposition of the matter and whether there are genuine issues regarding any such material facts. *Ralph Larsen & Son, Inc.*, 17 Cl. Ct. at 43; *Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 968 (Fed. Cir. 2009) (citing *Anderson*, 477 U.S. at 248, 250). To determine which facts are material, the Court needs to consider which factual issues "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. In deciding whether there are genuine issues of material fact, the Court "must draw all inferences in the light most favorable to the non-moving party." *Marriott Int'l Resorts, L.P.*, 586 F.3d at 968 (citing *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Only "[i]f no rational trier of fact could find for the non-moving party" can the Court grant a motion for summary judgment. *Id.*

## DISCUSSION

Both parties contend initially that this Court need only look at the Lease provisions to resolve this matter, yet both repeatedly reference disputes of material fact in support of their

respective contentions.  In light of such ongoing, material disputes of fact, it is clear to this Court

that it cannot grant summary judgment to either party at this time.

## I.        Breach of Contract

Plaintiff argues that GSA first breached the Lease by demanding adherence to Scheme W,

thus making GSA's termination of the lease for default unjustified.  *See* Pl. Mot. at 18; *see also*

OA Tr. at 25:12–18 (Plaintiff's Counsel: "And they reach the point to where [the Government]

issue[s] a cure notice that says you will build Scheme W or you will get defaulted. And that's

where the -- that's where things break down. And that is clearly a breach."  The Court: "And that

is the breach? That is what you are alleging in this case to be the breach?"  Plaintiff's Counsel:

"Yes, Your Honor.").  Defendant counters that GSA's instruction to resume work and implement

Scheme W did not constitute a breach based on the terms of the Lease as well as the parties' own

understanding of the design process.  *See* Def. Cross-Mot. at 31.

At the heart of the parties' dispute are the Lease provisions.  Section 3.09(b) of the Lease

states:

> THE LESSOR REMAINS SOLELY RESPONSIBLE FOR DESIGNING,
> CONSTRUCTING, OPERATING, AND MAINTAINING THE LEASED
> PREMISES IN FULL ACCORDANCE WITH THE REQUIREMENTS OF THE
> LEASE. The Government retains the right to review and approve many aspects of
> the Lessor's design, including without limitation, review of the Lessor's design and
> construction drawings, shop drawings, product data, finish samples, and completed
> base building and [tenant improvement] construction. Such review and approval is
> intended to identify potential design flaws, to minimize costly misdirection of
> effort, and to assist the Lessor in its effort to monitor whether such design and
> construction comply with applicable laws and satisfy all Lease requirements.

Lease Section L-1 (ECF No. 102-2) (Lease L-1) at 59.  Plaintiff contends that Section 3.09(b)

designated it "solely responsible" for the design of the courthouse and gave the Government only

limited authority to direct changes.  Pl. Mot. at 19.  Defendant counters that this interpretation is

far too broad.  OA Tr. at 53:6–19 (Defendant's Counsel: "I think that 3.09(b), read properly, really

shows or places the risk of design or responsibility for the design on the contractor here, but it doesn't have the same sort of obligation that EFC would like [] the Court to believe that it does, in the sense that the government certainly has a lot of authority to direct changes  . . . .").

Both parties also read Section 3.09 in conjunction with other clauses in support of their respective interpretations of the Lease.  *See id.* at 36:1–2 (Plaintiff's counsel directing the Court's attention to Section 3.09(b) and Paragraph 30 of the Lease as "key material facts"); *id.* at 53:8–9 (Defendant's counsel noting the interplay of Section 3.09(b), Section 29, and Section 4.16); *see also id.* at 61:14–16 (Defendant's Counsel: "[T]hat threshold question of whether there was a breach is addressed by the interplay of those clauses.").  Plaintiff argues that the Changes clause in the Lease limits the contracting officer's ability to direct changes to solely "Tenant Improvements."  Pl. Mot. at 20 (quoting Lease L-1 at 108).  In contrast, Defendant points to Section 29 as evidence that the Lease contemplates other changes to the design.  *See* OA Tr. at 57:15–23 (noting that Section 29 permits the contracting officer to require changes to the work or services being performed).  Defendant also argues that Section 4.16, which provides for a deviations and variances log, "undermines the [n]otion that this process . . . that actually occurred was definitely not contemplated by the parties here."  *Id.* at 58:18–20; *see* Lease L-1 at 72.

The plain meaning of the Lease provisions is not readily discernible, especially given the interplay between the various provisions.  Furthermore, both parties present reasonable, though differing, interpretations of the relevant Lease provisions.  Even viewed alone, Section 3.09 is rife with ambiguity.   Section 3.09 states that Plaintiff is "solely responsible" for "designing, constructing, operating, and maintaining the leased premises" but then proceeds to permit the Government to "retain[] the right to review and approve *many aspects*" of Plaintiff's design.  Lease L-1 at 59 (emphasis added).   It then proceeds to list examples of aspects of the design the

Government may review and approve but specifically notes that the list is not exhaustive.  *Id.* ("The Government retains the right to review and approve many aspects of the lessor's design, including without limitation . . . .").

To the extent that a contract's language can have more than one reasonable interpretation and is therefore ambiguous, the Court can look to extrinsic evidence to aid in its interpretation. *TEG-Paradigm Env't, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (internal citations omitted) ("When a provision in a contract is susceptible to more than one reasonable interpretation, it is ambiguous, and we may then resort to extrinsic evidence to resolve the ambiguity. We utilize extrinsic evidence to derive a construction that effectuates the parties' intent at the time they executed the contract."); *Oasis Int'l Waters, Inc. v. United States*, 134 Fed. Cl. 155, 184 (2017) ("Because an ambiguous or uncertain writing sometimes only can be understood upon consideration of the surrounding circumstances, courts may rely on extrinsic evidence to interpret an ambiguous contract clause.").  One type of extrinsic evidence that a court may turn to is the parties' intent at the time of contracting.  *Metro. Area Transit, Inc. v. Nicholson*, 463 F.3d 1256, 1260 (Fed. Cir. 2006) (quoting *Dureiko v. United States*, 209 F.3d 1345, 1356 (Fed. Cir. 2000)) ("When faced with an ambiguous contract, we 'construe its language to effect the parties' intent at the time they executed the [contract].'").

Yet doing so inevitably highlights the existence of disputed questions of fact in this matter. For example, the parties present competing narratives on the extent to which they understood there would be changes to Scheme 4 after signing the Lease.  Plaintiff contends that GSA's authority to change Scheme 4 was limited to review and approval of Plaintiff's design direction and "Tenant Improvements."  OA Tr. at 9:14–19 (Plaintiff's Counsel: "[Plaintiff was] told by GSA that after award, there would this DID workshop, but there would not be any changes to the shell and the

core of the building that the government would change, if it was going to make changes, only to the tenant improvement Space."); *id.* at 38:20–23 (Plaintiff's Counsel: "[T]he representations that were made to EFC during that [RLP] process were very clear. Shell and core would be locked down when there was an award. Things shouldn't be changing about that afterwards."). In contrast, Defendant argues that Plaintiff understood that Scheme 4 would not be the final design and that GSA would be able to direct necessary changes. *See* Camacho 30(b)(6) Deposition at 87:9–89:11; 94:5–10; Deposition of Nida Quilenderino, dated Feb. 22, 2024 (ECF No. 105-1) (Quilenderino Deposition) at 123:2–17; *see also* OA Tr. at 47:16–18 (Defendant's Counsel: "[W]e show that the changes that were ultimately made in Scheme W were going to have to be made anyway.").

Relevant not only to interpreting the Lease but also to the materiality of any potential breach is the parties' understanding of the benefit that Plaintiff expected under the Lease. *Thomas v. Dep't of Hous. & Urb. Dev.*, 124 F.3d 1439, 1442 (Fed. Cir. 1997) (holding that a breach is material if it "relates to a matter of vital importance, or goes to the essence of the contract"); *Lary v. U.S. Postal Serv.*, 472 F.3d 1363, 1367 (Fed. Cir. 2006) (analyzing materiality under the *Restatement (Second) of Contracts* factors). Plaintiff contends that sole responsibility of the courthouse design was of vital importance to it and a driving factor in bidding for the Lease. *See* Pl. Mot. at 27; *see also* OA Tr. at 74:9–12 (Plaintiff's Counsel: "[The project] was going to be a financial challenge for [Mr. Camacho], and because of that, it was of critical importance that he get to design and build a building that was going to work for him."). Defendant, however, pushes back on Plaintiff's argument by pointing out that Plaintiff was aware that its design would be altered, and at times, Plaintiff even solicited design changes and direction from GSA. *See, e.g.*, Email, dated June 11, 2015 (ECF No. 105-1) at 783; Email Chain, dated June 12, 2015 (ECF No.

105-1) at 784; Email, dated June 18, 2015 (ECF No. 105-1) at 786; Camacho 30(b)(6) Deposition at 87:9–89:11; 94:5–10; Quilenderino Deposition at 123:2–17.  As such, Defendant argues that sole responsibility of the courthouse design was not of vital importance to the Lease nor an important benefit that Plaintiff expected from the Lease.  OA Tr. at 49:4–10 (Defendant's Counsel: "[W]hether this sole responsibility for design was a matter of vital importance that goes to the essence of the contract, there is not a great argument that that would be the case here. The essence of the contract was building a building that the GSA was going to lease for 20 years or more."); *id* at 50:17–23 (Defendant's Counsel: "And so the extent to which [Plaintiff was] deprived of the benefit is almost not at all, because . . . GSA did not deprive EFC of all of its design authority. You know, they took Scheme 4, refined it according to the lease requirements, which everyone agrees . . . had to be made at some point anyway.").

As evinced from the discussion above, both parties offer vastly different characterizations of the emails, conversations, and recollections that currently constitute the record in this matter. Critical, then, to the disposition of these issues is the credibility of the parties' competing characterizations.  However, adjudicating such credibility issues would be inappropriate at the summary judgment stage.  *AT&T Advert., L.P. v. United States*, 147 Fed. Cl. 478, 484 (2020) (internal citation omitted) ("This means that to decide the issue, the Court would need to weigh the credibility of evidence, which is inappropriate at the summary judgment stage."); *see TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158 (Fed. Cir. 2004) ("[S]ummary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of the movant[']s witnesses.").

Rather, such credibility determinations are best reserved for trial.  *Cheung v. United States*, 146 Fed. Cl. 369, 379 (2019) ("The differences identified in the record, and the unclear

answers in the various deposition transcripts, lead the court to the conclusion that it will be important for the court to judge the credibility of the witnesses, for both the plaintiffs and for the government when their testimony is offered within the formality of a trial setting."). The Court finds that the competing testimony offered by the parties necessitates "the opportunity to hear testimony and an opportunity to judge the credibility of the witnesses." *Id.* at 381. As such, the Court finds that is unable to resolve this issue on summary judgment.

## II.     Waiver

Plaintiff also argues that the Lease explicitly prevented it from waiving its right to be "solely responsible" for the courthouse's design. Pl. Mot. at 30. The Lease states:

> No failure by either party to insist upon the strict performance of any provision of this lease or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial rent or other performance by either party during the continuance of any such breach shall constitute a waiver of any such breach of such provision.

Lease General Clauses (ECF No. 102-2) at 90. Plaintiff characterizes this clause as a no waiver clause that prohibits waiver of its right to be solely responsible for the courthouse design. Pl. Mot. at 31. Defendant counters, however, that even a no waiver clause can be waived. Def. Cross-Mot. at 41 (citing *Lake Charles XXV, LLC v. United States*, 118 Fed. Cl. 717, 724 (2014)).

As noted, the Court finds that there are genuine issues of material fact that preclude it from ruling on whether or not the Government breached the Lease. *See supra* Section I. As such, it would, in effect, constitute an impermissible advisory opinion for this Court to rule on the question of whether a no waiver clause can be waived, and if so, whether Plaintiff waived its rights in this action. *See Flast v. Cohen*, 392 U.S. 83, 96 (1968) (quoting C. WRIGHT, FEDERAL COURTS 34 (1963)) ("[I]t is quite clear that 'the oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions.'"); *see also Teva Pharms.*

13

*USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1337–38 (Fed. Cir. 2007) (quoting *Local No. 8–6, Oil, Chem. & Atomic Workers Int'l Union v. Missouri*, 361 U.S. 363, 367 (1960)) ("[F]ederal courts are to decide only 'actual controversies by judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in the case before it.'").  Accordingly, the Court declines, at this time, to rule on whether Plaintiff can and did waive its rights in this action.

## <u>CONCLUSION</u>

Neither party has demonstrated that it is entitled to summary judgment.  *See Mingus Constructors, Inc.*, 812 F.2d at 1391 ("The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts.");  *Marriott Int'l Resorts, L.P.*, 586 F.3d at 969  (citing *Mingus Constructors, Inc.*, 812 F.2d at 1391) ("To the extent there is a genuine issue of material fact, both motions must be denied.").

The present matter is rife with "material, factual differences between the parties" that the Court must wait to resolve until after the parties have had an opportunity at trial "to present their respective factual testimony while also giving the [C]ourt an opportunity to consider the credibility of the witness testimony offered and the relevance, and significance, of the documents admitted into the trial record."  *Cheung*, 146 Fed. Cl. at 376.

For the reasons set forth above, this Court **DENIES** Plaintiff's Corrected Motion for Partial Summary Judgment (ECF No. 102) and **DENIES** Defendant's Cross-Motion for Partial Summary Judgment (ECF No. 105).  The parties are directed to **CONFER and FILE** a Notice within 14 days of this Memorandum and Order, attaching a proposed public version of this Sealed Memorandum and Order.


IT IS SO ORDERED.



_Eleni M. Roumel_
ELENI M. ROUMEL
Judge


Dated: August 5, 2024
Washington, D.C.